UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| KARLA L. COSSEY and WILLIAM COSSEY, | ) ) ) | 4:02CV661 WKU |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | MEMORANDUM AND ORDER ON RECONSIDERATION OF THE DEFENDANTS' MOTION TO |
| ASSOCIATES' HEALTH AND WELFARE PLAN; and ADMINISTRATIVE COMMITTEE, ASSOCIATES' HEALTH AND WELFARE PLAN, | ) ) ) ) ) | AFFIRM THE DETERMINATION OF THE ADMINISTRATIVE COMMITTEE OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ) | |

Now before me is the defendants' supplemental brief in support of their motion to affirm the determination of the administrative committee or, alternately, for summary judgment. (Filing 220.) For the following reasons, I find that the defendants' motion for summary judgment must be granted in part.

## I.   BACKGROUND

On April 26, 2004, the plaintiffs, Karla and William Cossey, filed their sixth amended complaint against Defendants Associates' Health and Welfare Plan ("the Plan") and Administrative Committee, Associates' Health and Welfare Plan ("the Committee"), alleging violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. (ERISA). (See generally Sixth Am. Compl., filing 121.) The parties filed cross-motions for summary judgment, and I resolved those motions in a memorandum and order dated March 15, 2005. (See generally Mem. and Order on Mots. for Summ. J., filing 141.) More specifically, I granted the defendants' motion for summary judgment on the plaintiffs' claim for "statutory penalties," and I granted the plaintiffs' motion for summary judgment in part. (See id.) The basic facts of this case and the reasoning underlying my decision to grant the plaintiffs' motion in part have been set forth in earlier filings (see, e.g., filings 141, 193), but they will be summarized here in the

1

interest of convenience.

Wal-Mart Stores, Inc., created the Plan "to provide medical benefits to its employees." (Mem. and Order on Mots. for Summ. J., filing 141, at 1 (quoting filing 19 at 2).) The plaintiffs were eligible to receive benefits under the Plan. In October 2001, Karla Cossey sustained injuries in a car accident, and she retained counsel to file a personal injury lawsuit on her behalf. After medical bills for the treatment of Ms. Cossey's accident-related injuries began to issue, the Plan informed the plaintiffs' counsel that Ms. Cossey's claims for benefits would not be processed until the plaintiffs signed "reimbursement/subrogation forms" and their counsel completed a "disbursement agreement." (Id. at 2 (quoting Administrative Record ("A.R."), filing 32, at 167 202).)[1] Counsel objected to the Plan's refusal to pay benefits and asked the Plan to provide authority for its position that the payment of benefits could be conditioned on the execution of the aforementioned documents. (Id. at 3.) The defendants responded via letter dated June 11, 2002. In relevant part, this letter states,

> The Plan language includes a Right to Reduction, Reimbursement and Subrogation provision, which clearly states 100% reimbursement is required with no reduction for attorneys' fees. This provision further states 100% reimbursement is required regardless of whether the participant was made whole or not as well as that the Plan has first priority from any judgment, payment or settlement. . . .
>
> Please refer to page 43 of the enclosed Summary Plan Description. There it states, "To aid the Plan in its enforcement of its right of reduction, recovery, reimbursement and subrogation, you and your representative must, at the Plan's request and at its direction: Take any action; give information; and execute documents so required by the Plan. Failure to aid the Plan and to comply with such requests may result in the Plan's withholding or recovering benefits, services, payments or credits due or paid under the Plan."

(Id. at 3-4 (quoting A.R., filing 32, at 167 206).)

The plaintiffs and their attorney refused to execute the documents. As a result, the defendants refused to pay Ms. Cossey's accident-related claims. (See Mem. and Order on Mots. for Summ. J., filing 141, at 4-6.) Also, after the Plan learned that a settlement had been reached in Ms. Cossey's personal injury action, the Plan informed the plaintiffs that "Ms. Cossey's

---

[1]Copies of these documents appear in the Administrative Record, filing 32, at pages 167 203 and 167 217.

medical benefits are now subject to reduction since she has obtained a settlement from the third parties responsible for her injuries." (Id. at 5 (quoting filing 107, Ex. A-2 at 3).)

The plaintiffs argued that summary judgment ought to be granted in their favor because the defendants' decision to deny benefits was based on terms set forth only in a Summary Plan Description, or SPD, and not in the Plan itself. (See Mem. and Order on Mots. for Summ. J., filing 141, at 18 (citing filing 91 at 43-44, filing 113, ¶¶ 6, 20-21; filing 117 at 43-48; filing 134).) I agreed with the plaintiff's argument, and I concluded that "the defendants' decision to treat the SPD as a formal Plan document was 'contrary to the plan's clear language' and rendered 'the plan's language meaningless or internally inconsistent.'" (Id. at 28 (quoting Wald v. Southwestern Bell Customcare Medical Plan, 83 F.3d 1002, 1007 (8th Cir. 1996)).) I also found that "[t]here is no evidence that the denials of the plaintiffs' claims were . . . in accordance with the Plan's terms or were based upon a reasonable interpretation of the Plan's terms." (Id. at 29.) I therefore granted the plaintiffs' motion for summary judgment in part, stating, "the defendants' decision to deny the plaintiffs' claims for benefits was not reasonable." (Id. at 39; see also id. at 15 (quoting Wald, 83 F.3d at 1007).) The defendants moved for reconsideration of my determination that the SPD "does not contain the terms of the Plan," (filing 144 at 1), but I denied this motion in a memorandum and order dated November 21, 2005, (see filing 193).

The reasoning I applied in partially granting the plaintiffs' motion for summary judgment was soon adopted by another district court. See Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Gamboa, No 05-5007, 2006 WL 374764, at *4 n.3 (W.D. Ark. Feb. 7, 2006). The Administrative Committee appealed that court's judgment, and one of the parties in the case before me proposed that further proceedings be stayed until the Eighth Circuit resolved that appeal. After discussing the matter with the parties in a telephone conference on or about March 29, 2006, I agreed that a stay would be appropriate.

On March 7, 2007, the Eighth Circuit reversed the district court's judgment in Gamboa and remanded the case for further proceedings. See Administrative Committee of the Wal-Mart Stores, Inc. v. Gamboa, 479 F.3d 538 (8th Cir. 2007). The Eighth Circuit held that the entire SPD was a part of the Plan and that the Administrative Committee reasonably concluded that the reimbursement provision appearing in the SPD obliged the defendants "to reimburse the Plan for judgments or settlements obtained because of an accident." Id. at 541; see also id. at 546 ("Our

3

consideration of the Finley factors convinces us that the Administrative Committee's interpretation was reasonable and not an abuse of discretion.").

The parties then requested a hearing to determine how this case ought to proceed. (See filings 210-211.) This hearing was held, telephonically, on or about June 6, 2007. Following that hearing, I entered an order that, inter alia, granted the parties an opportunity to file briefs addressing the issues that, in their view, ought to be resolved in the wake of Gamboa. (See Order on Progression of Case, filing 215.) Those briefs are now before me, (see filings 220, 221, 224), and my analysis of the issues raised by the parties is set forth below.

## II.   ANALYSIS

The threshold issue in this case is whether the defendants' decision to deny Karla Cossey's accident-related claims for benefits amounted to an abuse of discretion. (See Mem. and Order on Mots. for Summ. J., filing 141, at 7-15 (describing standard of review for suits brought pursuant to 29 U.S.C. § 1132(a)(1)(B)).) "In applying an abuse of discretion standard, [I must affirm the Committee's decision] if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." Administrative Committee of the Wal-Mart Stores, Inc. v. Gamboa, 479 F.3d 538, 542 (8th Cir. 2007) (quoting Groves v. Metro. Life Ins. Co., 438 F.3d 872, 875 (8th Cir. 2006)). In other words, "[w]here the plan administrator offers a reasonable interpretation of a plan, the district court should not substitute a different, though also reasonable, interpretation that could have been made." Id. at 541-42 (citations omitted).

My analysis "begin[s] with the language of the Plan." Gamboa, 479 F.3d at 542. As noted above, I determined previously that the defendants' decision to deny Karla Cossey's claims for benefits was not based on a reasonable interpretation of the Plan because their decision depended upon terms that were not a part of the Plan. Clearly, however, that determination cannot stand in light of the Eighth Circuit's decision in Gamboa. For the reasons explained by the Eighth Circuit, the terms of the SPD that were cited by the defendants in support of their decision to deny the claims are indeed part of the Plan, and it was reasonable for the defendants to treat them as such. As a result, I must vacate the portion of the memorandum and order of March 15, 2005, in which I concluded that the plaintiffs' motion for summary

judgment must be granted in part, and I must reconsider whether the defendants' decision to deny benefits was an abuse of discretion.

The defendants submit that their decision to deny Karla's accident-related claims was reasonable in light of the plaintiffs' refusal to execute a "Reimbursement-Subrogation Agreement" and the plaintiffs' attorney's refusal to execute a "Disbursement Agreement." (See generally Mem. in Supp. of Defs.' Mot. to Affirm Determination of the Administrative Committee, filing 19; see also Combined Mem. in Supp. of Defs.' Supplemental Mot. to Affirm the Determination of the Administrative Committee, filing 106, at 2-4, 6, 8-18; Supplemental Br. in Supp. of Defs.' Mot. to Affirm Determination of the Administrative Committee, filing 220, at 5-19.) In support of this argument, the defendants rely primarily on the following terms, which appear in the 2002 Associate Benefits Book:[2]

> To aid the Plan in its enforcement of its right of reduction, recovery, reimbursement and subrogation, you and your representative must, at the Plan's request and at its discretion:
> -     Take any action;
> -     Give information; and
> -     Execute documents so required by the Plan.
>
> Failure to aid the Plan and to comply with such requests may result in the Plan's withholding or recovering benefits, services, payments or credits due or paid under the Plan.

(A.R., filing 32, at 167 65. See also, e.g., filing 220 at 7.)

In order to determine whether the defendants' decision to deny the plaintiffs' claims was reasonable in light of the foregoing terms, I must consider the following factors: whether the defendants' interpretation of the Plan "contradicts the plan's clear language, whether the interpretation renders any plan language internally inconsistent or meaningless, whether the administrator has interpreted the words at issue consistently, whether the interpretation is

---

[2] As I noted in my memorandum of March 15, 2005, it is not clear whether the terms of the 2001 Associate Benefits Book or the 2002 Associate Benefits Book are controlling in this case. (See filing 141 at 15 n.10.) Although the defendants quoted the terms of the 2001 Associate Benefits Book in their motion for summary judgment, (see filing 19 at 5-8 (quoting Loftus Aff., filing 32, Ex. B-2)), only the 2002 Associate Benefits Book has been included in the Administrative Record, (see generally filing 32). I have chosen to treat the 2002 Associate Benefits Book as the controlling document, but I note that the relevant portions of each Book are nearly identical.

consistent with the plan's goals, and whether the interpretation conflicts with any substantive or procedural requirements of ERISA." Administrative Committee of the Wal-Mart Stores, Inc. v. Gamboa, 479 F.3d 538, 542 (8th Cir. 2007) (citing Riddell v. Unum Life Ins. Co. of America, 457 F.3d 861, 864 (8th Cir. 2006)). I find that each of these factors supports the conclusion that the defendants' interpretation of the Plan was reasonable.

First, the Plan's language–now that it has been established that the SPD is indeed part of "the plan"–clearly provides that covered persons and their representatives must execute documents "at the Plan's request and at its direction" in order "[t]o aid the Plan in its enforcement of its right of reduction, recovery, reimbursement, and subrogation." (A.R., filing 32, at 167 65.) Furthermore, the Plan states specifically that "benefits, services, payments or credits due . . . under the Plan" may be withheld in the event that the Plan's requests are not satisfied. (Id.) It seems to me that it is reasonable to interpret the term "documents" to encompass Reimbursement-Subrogation Agreements and Disbursement Agreements, and it is reasonable to interpret the term "representatives" to encompass attorneys representing covered persons. Thus, the defendants' determination that the Plan allowed them to withhold benefits if the plaintiffs failed to execute a Reimbursement-Subrogation Agreement or if counsel failed to execute a Disbursement Agreement is consistent with the Plan's clear language.

Second, there is no indication that the defendants' interpretation of the relevant terms rendered any Plan language internally inconsistent or meaningless.

Third, there is no evidence that the defendants have interpreted the language at issue inconsistently. On the contrary, it is undisputed that whenever a third party may be responsible for a covered person's injuries, the defendants will not pay medical benefits until the covered person signs a Reimbursement-Subrogation Agreement and the covered person's attorney signs a Disbursement Agreement. (See Mem in Supp. of Defs.' Mot. to Affirm Determination of the Administrative Committee, filing 19, Statement of Undisputed Material Facts ¶¶ 7-8; Pls.' Response to Defs.' Statement if Undisputed Material Facts, filing 113, ¶¶ 7-8.)

Fourth, the defendants' interpretation is consistent with the Plan's goals. As the defendants argued previously,

> The goal behind the Plan's reimbursement provision is to allow the Plan to recoup monies paid by the Plan which have been paid by the responsible third party to the covered person or her legal representative. The Plan initially pays benefits so

> that there is no loss to the covered person.  This payment of benefits is conditioned on the covered person's promise that, if recovery from other parties is obtained, the Plan will be reimbursed.  Through enforcement of the subrogation/right of recovery provision, the third party pays for the injuries that he caused.  This allows the Plan to recover Plan assets for future claims thereby discharging on [sic] of the Plan's most fundamental fiduciary obligations, protecting Plan assets by preventing double recovery by the covered person at the expense of the Plan and its other participants.  Requiring these Agreements is a reasonable requirement in furtherance of the Plan's goal of protecting the Plan's assets.

(See Mem in Supp. of Defs.' Mot. to Affirm Determination of the Administrative Committee, filing 19, at 16.)  Cf. Gamboa, 479 F.3d at 545-46 ("A self-funded plan generally has limited resources, and the right of reimbursement or subrogation in certain instances 'is an extremely important tool for maintaining the financial viability of such plans.'").

Finally, the defendants' interpretation does not conflict with any substantive or procedural requirements of ERISA.  Indeed, courts have held in analogous cases that benefits may be conditioned on an attorney's execution of a "Subrogation Agreement," see Kress v. Food Employers Labor Relations Association, 391 F.3d 563, 568-70 (4th Cir. 2004), or on a plan participant's execution of a similar document, see Cagle v. Bruner, 112 F.3d 1510, 1517-18, 1519-20 (11th Cir. 1997); Alves v. Silverado Foods, Inc., 6 F. App'x 694, 704-05 (10th Cir. 2001) (quoting Cagle, 112 F.3d at 1520).

In opposition to the defendants' motion, the plaintiffs argue that the defendants' interpretation of the Plan is "arbitrary and capricious" because, according to the relevant terms of the Plan, "the Cosseys were obligated to 'execute documents' . . . only to aid the Plan in the enforcement of its right to reimbursement."  (Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 3.)  Because the Plan's right to reimbursement does not arise until after the Plan pays benefits, the plaintiffs assert that the defendants cannot, under the Plan's own terms, require the plaintiffs to "execute documents" until after benefits have been paid.  (See id. at 2-3.)  In support of their argument, the plaintiffs rely upon Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Cossey, 287 F. Supp 2d 975 (E. D. Ark. 2003), a "companion case" to the instant action.  (See filing 221 at 2.)  In Cossey, Judge Wilson denied the Administrative Committee's motion "for an equitable injunction in the form of a lien or constructive trust under 29 U.S.C. § [1132](a)(3), seeking to preserve

$69,576.42 [of the settlement funds obtained by the Cosseys] until the Plan's right to reimbursement has been determined." 287 F. Supp. 2d at 977. The sum that the defendants sought to preserve equaled the amount of the medical claims that the Cosseys had presented to the Plan, but the Plan had paid only $110.46 toward these claims. In support of his decision to deny the Administrative Committee's motion, Judge Wilson noted that the Plan specifically states, "The Plan's right to reimbursement applies when the Plan pays medical benefits, and a judgment, payment, or settlement is made on behalf of the covered person for whom the medical benefits were paid." Id. at 978 (citation and emphasis omitted).

  I agree with the plaintiffs' suggestion that the defendants have no right to reimbursement of funds that they never paid. The question at hand, however, is not whether the defendants were (or are) entitled to reimbursement, but whether they reasonably interpreted the Plan's language to allow them to condition the payment of benefits on the execution of documents "[t]o aid the Plan in its enforcement of its right of reduction, recovery, reimbursement and subrogation." (A.R., filing 32, at 167 65.) Judge Wilson's opinion in Cossey does not speak to this question, but the Eleventh Circuit has addressed it squarely. In Cagle v. Bruner, 112 F.3d 1510, 1517-18 (11th Cir. 1997), an ERISA-governed plan (the "Fund") argued that the following language allowed it to require a plan participant to sign a subrogation agreement before benefits would be paid:

> Subrogation seeks to conserve the assets of the Benefit Fund by imposing the expense for accidental injuries suffered by members or eligible dependent's [sic] on those responsible for causing them. If you or one of your dependents, for example, should receive benefits from the Fund for injuries caused by someone else (such as an automobile accident,) the Benefit Fund through subrogation has the right to seek repayment from the other party or his insurance company, or in the event you or your dependent recovers the amount of medical expense paid by the Fund by suit, settlement or otherwise from any third person or his insurer, the Fund has the right to be reimbursed therefor through subrogation.
>
> The Benefits Fund will provide benefits to you and your dependents at the time of need, but you may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund.

The court determined that the Fund's interpretation of the plan was not arbitrary and capricious. See id. at 1519-20. In reaching this conclusion, the court stated,

> [T]he district court determined that the Fund unreasonably interpreted the plan to

> allow it to require a signed subrogation agreement prior to paying benefits. According to [the plan participant/defendant], the district court correctly found the Fund's position to be unreasonable, because the Fund has no right of subrogation until benefits are paid. We believe that [the defendant] is confusing the issues. It is true that because the Fund has no right of subrogation until the plan pays benefits, it cannot enforce the subrogation agreement until it pays benefits. Nevertheless, nothing in the plan forbids the Fund from requiring the agreement to be signed before it pays any claims. The SPD states that "[the participant or beneficiary] may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund." That language can be read to require execution of the subrogation agreement before payment as easily as it can be read to require execution of the agreement after payment. Thus, the Fund's interpretation is not unreasonable, given the language of the plan.

Id. at 1520. It seems to me that the plaintiffs in the instant case are also "confusing the issues." Id.; see also Copeland Oaks v. Haupt, 209 F.3d 811, 815 & n.2 (6th Cir. 2000); Alves v. Silverado Foods, Inc., 6 F. App'x 694, 704-05 (10th Cir. 2001). Even though the defendants' right to reimbursement was not ripe, it does not follow that the defendants acted arbitrarily and capriciously when they required the plaintiffs and their attorney to execute the Reimbursement-Subrogation Agreement and Disbursement Agreement prior to the processing of the plaintiffs' claims. As in Cagle, here the terms of the Plan do not forbid the defendants from requiring the execution of the agreements before paying benefits. On the contrary, the Plan states specifically that the failure to comply with requests to execute documents "may result in the Plan's withholding . . . benefits." (A.R., filing 32, at 167 65.) This provision would be rendered a nullity if the defendants were required to pay benefits before requesting documents. Thus, the defendants' interpretation of the Plan did not amount to an abuse of discretion.

The plaintiffs argue next that I should "reject" Kress v. Food Employers Labor Relations Association, 391 F.3d 563 (4th Cir. 2004), because the court failed to consider that "requiring attorneys for plan participants to sign disbursement agreements runs counter to Model Rule 1.7(b)," along with the Eighth Circuit's opinion in Southern Council of Industrial Workers v. Ford, 83 F.3d 966 (8th Cir. 1996), Judge Wilson's opinion in Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Cossey, 287 F. Supp 2d 975 (E. D. Ark. 2003), and decisions of the Ninth and Eleventh Circuit Courts of Appeals. (Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 4 (citing, inter alia, Hotel Employees & Restaurant Employees Int'l Union Welfare Fund v. Gentner, 50 F.3d

9

719 (9th Cir. 1995); Chapman v. Klemick, 3 F.3d 1508 (11th Cir. 1993)).)  More specifically, the plaintiffs argue,

> Requiring the Cosseys' attorney to sign a Disbursement Agreement in favor of the Plan's claimed right of reimbursement, when the Plan and the Cosseys espouse adverse positions on that claimed right, would invoke the "competing allegiances" and "unacceptable conflicts of interest" that the Eighth Circuit cautioned against in Ford, and that Judge Wilson noted in Cossey . . . .  As such, Kress is contrary to Eighth Circuit law, not to mention the law of this district.

(Id. at 4-5.)  I am not persuaded.

In Ford, Southern Council maintained an employee benefit plan that included "a subrogation clause providing that Southern Council would be subrogated, to the extent of payments it had made, to the rights of a beneficiary to receive or claim indemnification from a third party."  83 F.3d at 967-68.  Ford, a beneficiary under the plan, received $39,971.35 in benefits payments from the plan after she sustained injuries in a supermarket.  Ford retained Mr. Thompson to represent her in a personal injury action against the supermarket, and "Ford and Thompson signed a subrogation agreement providing that they would reimburse the fund from the proceeds of any recovery received for Ford's injuries."  Id. at 968.  Ford's claim against the supermarket was settled for $150,000, and after the settlement proceeds were released to Ford, Ford paid Southern Council only $10,000 in reimbursement.  Seeking to recover the balance of the payments it made on Ford's behalf, Southern Council filed suit, claiming, inter alia, that 1) Thompson breached his fiduciary duty to the plan by failing to reimburse the fund, and 2) Ford and Thompson violated the plan's subrogation clause and the subrogation agreement.  The Eighth Circuit found that the complaint failed to state a claim against Thompson for a violation of a fiduciary duty owed to the plan, stating,

> Thompson did not become a plan fiduciary merely by representing Ford or by related control over the settlement proceeds.  Southern Council's argument that the result here should be different because Thomson signed the subrogation agreement is unpersuasive.  "An attorney has an ethical obligation to his or her client that does not admit of competing allegiances."  Chapman [v. Klemick, 3 F.3d 1508, 1511 (11th Cir. 1993)].  Accordingly, to impose fiduciary liability on Thompson would be to subject him to "unacceptable conflicts of interest."  Id.  Moreover, the subrogation agreement did not by its terms purport to make Thompson a fiduciary of the plan.

Ford, 83 F.3d at 968 (citations omitted).  The court also found, however, that "[b]ecause

10

Thompson himself signed the subrogation agreement, we conclude that the complaint . . . stated an ERISA claim against him for violation of the subrogation clause." Id. at 969.  Seizing upon the statements, "An attorney has an ethical obligation to his or her client that does not admit of competing allegiances," and, "[T]o impose fiduciary liability on [the attorney] would be to subject him to 'unacceptable conflicts of interest,'" the plaintiffs assert that "[t]he same would hold true for contractual liability imposed on an attorney under a Disbursement Agreement." (Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 4.)  I take the plaintiffs' argument to be that requiring counsel to sign a Disbursement Agreement would create the same "competing allegiances" and "unacceptable conflicts of interest" that would arise if fiduciary liability were imposed on counsel.  But the Eighth Circuit clearly held in Ford that counsel's execution of the subrogation agreement gave rise to an ERISA claim against him, and the court made no findings suggesting that counsel's execution of the agreement would interfere with his obligations to his client or subject him to "unacceptable conflicts of interest." On the contrary, the court made clear that the imposition of fiduciary liability would give rise to "unacceptable conflicts of interest," and it held specifically that Thompson's signing of the subrogation agreement did not make him a fiduciary of the plan.  Ford, 83 F.3d at 968.

    The Disbursement Agreement at issue in this case provides,

> I, the attorney representing the above named Plan participant/my client for injuries incurred due to the aforementioned accident, understand that Associates' Health and Welfare Plan (the Plan) claims a right to reimbursement as an ERISA governed plan.  I agree not to disburse any funds from the settlement until such right to reimbursement with the Plan has been resolved.  Signature herewith is not an admission to the Plan's 100% reimbursement requirement.  In consideration of execution of his agreement, the Plan agrees to continue to provide future medical benefits to the Plan participant/my client in accordance to the terms of the Plan and not to withhold benefits otherwise allowed by the terms of the Plan.

(A.R., filing 32, at 167 203.)  It seems to me that this agreement does not purport to make the Cosseys' counsel a fiduciary of the Plan, and I am not persuaded that Ford stands for the proposition that the signing of such an agreement would cause counsel to face unacceptable conflicts of interest.  Indeed, Ford seems to support the opposite conclusion.  Therefore, I reject the plaintiffs' argument that Kress v. Food Employers Labor Relations Association, 391 F.3d 563 (4th Cir. 2004), is contrary to Ford.

11

As noted above, the plaintiffs also cite Judge Wilson's decision in <u>Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Cossey</u>, 287 F. Supp 2d 975, 979 (E. D. Ark. 2003); Model Rule 1.7(b); <u>Chapman v. Klemick</u>, 3 F.3d 1508 (11th Cir. 1993); and <u>Hotel Employees & Restaurant Employees Int'l Union Welfare Fund v. Gentner</u>, 50 F.3d 719 (9th Cir. 1995), for the proposition that attorneys would be made to serve "two adverse masters" if the defendants are allowed to require attorneys to execute Disbursement Agreements as a condition to paying benefits. (Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 4.) However, because the signing of the Disbursement Agreement at issue in this case would not make counsel a fiduciary of the Plan, <u>see</u> <u>Ford</u>, 83 F.3d at 968, the execution of the agreement would not create the sort of conflict of interest noted in the authorities cited by the plaintiffs, <u>see</u> <u>Gentner</u>, 50 F.3d at 723; <u>Chapman</u>, 3 F.3d at 1511-12; <u>Cossey</u>, 287 F. Supp. 2d at 979.

Finally, the plaintiffs argue that <u>Kress</u> is distinguishable from the instant case on its facts, and is therefore "non-persuasive." (Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 4-5.) In <u>Kress</u>, a "welfare benefit plan governed by ERISA" (the Fund) included a term stating that "'[b]enefits are not payable if the disability is due to an injury or sickness which . . . is . . . the responsibility of' a third party." 391 F.3d at 566. The Fund's SPD also contained the following language, however:

> Waiting for a third party to pay for these injuries may be difficult. Recovery from a third party can take a long time (you may have to go to court), and your creditors will not wait patiently. Because of this, as a service to you, the Fund will pay your (or your eligible dependent's) expenses based on the understanding that you are required to reimburse the Fund in full from any recovery you or your eligible dependent may receive, no matter how it is characterized. This process is called "subrogation."
>
> . . . .
>
> . . . [Y]our acceptance of benefits from the Fund means that you have agreed to reimburse the Fund–in full–for any benefits it has paid from any settlement, judgment, insurance, or other payment you, your eligible dependent, or your attorney receive as a result of your accident. It does not matter how these amounts are characterized, why they are paid, or whether or not these other payments are specified as being for your Accident and Sickness or Medical bills. The Fund requires that you and/or your eligible dependent (if applicable) and your or your dependent's attorney fill out, sign, and return to the Fund office a

> subrogation agreement that includes a questionnaire about the accident. Your claim will not be deemed complete and will be pended for payment until your fully executed subrogation agreement is received by the Fund office. If it is not completed in a timely fashion, your claim will be denied.

Id. (emphasis omitted). After Kress was injured by a third party, "the Fund sent Kress the [subrogation a]greement so that he could receive his expenses subject to its terms." Id. at 567. Although Kress himself signed the agreement, his attorney refused, and the Fund determined that Kress was not entitled to receive "Accident and Sickness" benefits. Id. The Fourth Circuit held that the Fund could condition the payment of these benefits on the attorney's execution of the subrogation agreement. See id. at 568-71.

The plaintiffs' argument that Kress is "non-persuasive" is based on the fact that in Kress, the Fund "was not obligated to pay the plan participant's medical expenses"; in contrast, "it is undisputed that the Cosseys' medical benefits were 'covered' by the Plan's terms." (Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 5 (citing Gorman v. Carpenters' & Millwrights' Health Benefit Trust Fund, 410 F.3d 1194 (10th Cir. 2005)).) Clearly, the distinction noted by the plaintiffs does exist. Moreover, Kress states, "Since third-party accident and sickness benefits are not even covered by the Fund, nor required by ERISA, it makes little sense to argue that ERISA precludes imposing conditions on the receipt of benefits that are in effect an interest-free loan." 391 F.3d at 568. Thus, it is arguable not only that Kress is distinguishable from the instant case, but also that Kress does not stand for the proposition that ERISA permits the conditioning of benefits payments on the execution of subrogation agreements. However, after noting that third-party accident benefits were neither covered by the Fund nor required by ERISA, the court proceeded to analyze–in some detail–whether ERISA precludes the Fund's "attorney signature requirement." Id. at 569. The court stated,

> Indeed, "ERISA neither requires a welfare plan to contain a subrogation clause nor does it bar such clauses or otherwise regulate their content." Subrogation clauses requiring reimbursement are, in fact, quite common. ERISA allows plans broad discretion to draft such clauses. Plans could forego any reimbursement unless and until the participant is "made whole." They could provide for attorneys fees to be paid in full before the plan is reimbursed at all. They could share the expense of legal fees in a pro-rate fashion, proportionally reducing their reimbursement to reflect the attorney fee. They could adopt a "reasonable fee" policy, meaning that they will subtract from the amount of the required reimbursement whatever they would have spent in legal fees to recover

> the advance they had paid. Or, as here, they may require that attorney fees be paid only after the Fund is reimbursed in full.
>
> . . . .
>
> The addition of an attorney signature requirement is a difference of degree, not of kind. . . .
>
> <u>Since circuit law interpreting ERISA plainly permits a plan to recoup any advance it has made to a participant before an attorney makes a claim on a subsequent award, we see no reason to impede a plan from requiring pre-commitment to this state of affairs</u>. Congress placed no restrictions in ERISA on reimbursement provisions. Were we to import such limits now, we would contravene ERISA's purpose of "promot[ing] the interests of employees and their beneficiaries in the employee benefit plans," because such restrictions would surely discourage plan sponsors from providing the very sorts of accident and sickness benefits that the Fund offered to <u>Kress</u>.

Id. at 569-70 (citations omitted) (emphasis added). I find the court's analysis in <u>Kress</u> to be persuasive, notwithstanding the factual differences between that case and the case now before me. As the court explained, ERISA gives plans broad discretion to draft reimbursement clauses, and therefore there seems to be no reason to prohibit the defendants from requiring the plaintiffs' attorney to sign a document that acknowledges the existence of Plan's reimbursement claim and commits counsel to preserving the settlement funds until the reimbursement claim is resolved.[3]

---

[3] I note in passing that here, unlike in <u>Kress</u>, the Disbursement Agreement did not require the plaintiffs' attorney to concede that the Plan was entitled to "100% reimbursement." <u>Compare</u> <u>Kress</u>, 391 F.3d at 567-68 (noting that the subrogation agreement required that the plaintiff reimburse the Fund "before all others") <u>with</u> (A.R., filing 32, at 167 203 ("Signature herewith is not an admission to the Plan's 100% reimbursement requirement.")).

Relatedly, I find that the instant case is distinguishable from <u>Gorman v. Carpenters' & Millwrights' Health Benefit Trust Fund</u>, 410 F.3d 1194 (10th Cir. 2005), which is cited in the plaintiffs' brief, filing 221, at page 5. In <u>Gorman</u>, the Carpenters' and Millwrights' Health Benefit Trust Fund (the Fund) required a Fund beneficiary, his wife, and his attorney to sign a "Subrogation Agreement Contract," or "SAC," as a precondition to the payment of benefits. <u>See</u> 410 F.3d at 1196-97. The SAC included additional conditions that did not appear in the plan, including a requirement that the beneficiary "file a third-party action at his own expense in order to obtain his vested medical benefits resulting from the injuries he sustained in an accident." <u>Id.</u> at 1196. The court held that "the SAC attempted to broaden the Fund's rights by imposing a new requirement on [the beneficiary] as a condition for receiving benefits," and that "[b]ecause that requirement was not contained in the 1999 SPD, it was arbitrary and capricious for the Fund

My finding that the defendants' decision to deny Karla Cossey's accident-related claims did not amount to an abuse of discretion has several ramifications. First, I find that the defendants are entitled to summary judgment on the plaintiffs' claims under 29 U.S.C. §§ 1132(a)(1), (a)(2), and (a)(3), including the plaintiffs' claims for "plan-wide relief," (see Cosseys' Response to Supplemental Br. in Supp. of Defs.' Mot. to Affirm, filing 221, at 6-9; see also Pls.' Mot. for Summ. J. & Supporting Mem., filing 91, at 52-56 (summarizing the relief requested by the plaintiffs)), to the extent that those claims are based on the defendants' decision to deny Ms. Cossey's accident-related claims. Because I have also found that the defendants are entitled to summary judgment on the plaintiffs' claims for statutory penalties, (see Mem. and Order on Mots. for Summ. J., filing 141, at 35-39), virtually none of the plaintiffs' claims remain viable. Indeed, all of the issues mentioned specifically by the parties in the current round of briefs are now resolved. (See generally filings 220, 221, and 224.) I note, however, that the plaintiffs appear to have raised at least two claims that do not stem directly from the defendants' denials of Ms. Cossey's accident-related claims. (See Sixth Am. Compl., filing 121, ¶¶ 50-59.) The status of these two claims is unclear, and I am not convinced that the conclusions I have reached in this memorandum necessarily resolve them. It seems to me, therefore, that a status conference is in order. Counsel should confer with one another, and with my chambers, to arrange this conference as soon as it is practical to do so.

**IT IS ORDERED** that:

1. The portion of the memorandum and order of March 15, 2005, granting the plaintiffs' motion for summary judgment in part, (see filing 141), is vacated;

2. The plaintiffs' motion for summary judgment, filing 91, is denied; and

---

to impose the new condition as a prerequisite to paying [the beneficiary] his benefits under the 1999 SPD." Id. at 1200. Here, however, the defendants did not attempt to "broaden their rights," because neither the Reimbursement-Subrogation Agreement nor the Disbursement Agreement added a new requirement that does not appear in the Plan. (Compare A.R., filing 32, at 167 64-65 (setting forth the Plan's terms with respect to reduction, recovery, reimbursement and subrogation, including the participant's responsibilities to aid the Plan in its enforcement of those rights) with id. at 167 203 (the Disbursement Agreement), 167 217 (the Reimbursement-Subrogation Agreement).) Instead, those agreements merely served to protect the defendants' existing rights under the terms of the Plan.

3.  The "Defendants' Motion to Affirm the Determination of the Administrative Committee or, Alternatively, Motion for Summary Judgment," filing 18, and the "Defendants' Supplemental Motion to Affirm the Determination of the Administrative Committee or, Alternatively, Motion for Summary Judgment," filing 105, are granted in part, as explained in the memorandum accompanying this order.

Dated January 30, 2008.

       BY THE COURT

       s/ Warren K. Urbom
       United States Senior District Judge